HENRY ROBINSON AND OTHERS,
vs.
WASHINGTON DECATUR ROBINSON
AND OTHERS.

} SEPTEMBER TERM, 1852.

[INADEQUACY OF PRICE—CONSTRUCTION OF WILL.]

A TESTATOR by his will manumitted his negroes, and devised certain real estate to a trustee "in trust to be rented out by him, and the rents and profits to be received by him and annually paid to" said negroes, "or their order, attested by some justice of the peace," and directed the trustee, upon the death of any of these legatees to pay over "whatever property he shall then have, as trustee to the legal representatives and heirs at law of the deceased, unless the deceased shall make some other appointment by his last will and testa-ment duly executed." He then gave the trustee the power to sell the lands,

with the desire of the *cestui que trusts* of full age, and invest the proceeds in some safe securities for their benefit, but this power he revoked by a codicil, and expressed a desire that no part of the trust estate should be sold. HELD—That by this will the negroes had no power in their lifetime to make an absolute disposition of this property.

In the judicial interpretation of wills, the intention of the testator, to be gathered from the entire instrument, must prevail unless it violates some established principle of law.

If the grantor be *compos mentis*, and there be no fraud or imposition practiced upon him by the grantee, the transfer must stand though the thing sold be worth four times as much as by the contract was agreed to be paid for it.

Where property is sold for $750, which is worth $2800, the inadequacy is so great as to shock the conscience, and to amount in itself to conclusive and decisive evidence of fraud, and would of itself be a sufficient ground for refusing a specific performance of the contract if it remained unperformed.

—

[The bill in this case was filed in May, 1850, by Henry Robinson, a free negro, and others, free negroes, against Washington D. Robinson and others, free negroes, and John D. Farquharson, for the sale of certain real estate devised to William Rea, in trust for them, by William S. Harper, of Dorchester county. The bill alleges among other things that William Rea had declined the trust, and that John D. Farquharson had been appointed by the Court of Chancery trustee in his stead ; that the land was deteriorating in value, and that it would be for the advantage of all parties interested to sell the same, and that the proceeds be divided among the parties interested, according to their several respective proportions, and invested for their use and benefit. This bill also states that negroes Daniel and John, mentioned in said will, have, since the death of the testator, died intestate, leaving complainants and defendants their heirs at law. The will of William S. Harper, filed as an exhibit with this bill, is dated the 17th of February, 1838, by which, after payment of debts and funeral expenses, he disposes of his property as follows :

By the third clause he bequeaths a horse to his negro boy Henry. By the fourth he directs all his personal estate not otherwise disposed of to be sold by his executor on one year's credit, with security, bearing interest from date till paid, and the money, when received from said sale, and whatever money

may be due him at the time of his death, to be equally divided, share and share alike, between the negroes manumitted by the succeeding clause of his will, and the same paid over to them severally, at such times and in such sums as the trustee named in the will shall deem proper.

"Fifth. It is my will and desire that my eight negroes, to wit : Old John, Kate, Daniel, Mary, Hannah, Henry, Ann, and Nancy, shall be free immediately after my death."

"Sixth. I give and devise to my friend William Rea, of Cambridge, his heirs and assigns forever, my plantation whereon I now live, and all the lands thereto belonging, (except one acre where my dear wife is buried, which I wish always kept sacred as a burial ground,) upon trust that the said plantation shall be rented out by him, and the rents and profits received by him and paid over to my negro boy Daniel, or his written order, attested by some justice of the peace. I also devise to William Rea, his heirs and assigns, all the land that I purchased of Francis H. Waters and George Robertson and wife, that lie eastward of a line drawn north by west across said land, beginning at the lane between my land and Jacob Wilson's, where my cross fence joins said land ; from thence running that line until it intersects the line between my land and Thomas Smoot's land. I also give to William Rea all my right to that tract of land called "Expectation," surveyed by me and Thomas Smoot, lying at Crotchett's Ferry, all which lands are given and devised to William Rea, in trust, to be by him rented out, and the rents and profits received by him, and paid over annually to my negro boy Daniel, or his order, attested by some justice of the peace."

"Seventh. I give and devise to William Rea, his heirs and assigns, all the residue of the lands I purchased of Francis H. Waters and George Robertson and wife, (which I have not already devised to William Rea in trust for my negro boy Daniel.) Also, all the lands I purchased from Thomas Birely and wife, I devise to William Rea and his heirs, all in trust, to be rented out by him and annually paid to my negro boy Henry, or his order, attested by some justice of the peace."

"Eighth. I give and devise to William Rea, his heirs and assigns forever, all the lands I purchased from James A. Waddell, sheriff, as the property of James Webster, or Powell and Feddeman, and any other real estate not already devised in trust to be rented out by him, and the money received by him, and equally divided between my six negroes, to wit : Old John, Kate, Mary, Hannah, Ann, and Nancy, and their respective proportions paid annually to each one, or his or her order, attested by some justice of the peace."

"Ninth. I will and declare that any and all receipts given by any legatee, or *cestui que trust*, attested by any justice of the peace, shall be good and effectual releases and discharges for the same, or so much thereof as in such receipt or receipts shall be expressed to be received."

"Tenth. It is my will and desire that immediately after the decease of any of the legatees, or *cestui que trusts*, Wm. Rea, trustee as aforesaid, shall pay over whatever property he shall then have as trustee to the legal representatives and heirs at law of the said deceased, unless the deceased shall make some other appointment by his last will and testament executed according to law."

"Eleventh. If any bequest or devise contained in this my last will and testament shall fail to take effect from any cause, in such an event I will and declare that the trustee and executor by this will appointed, shall immediately transfer the equitable and legal title to the same to the state of Delaware, for the benefit of the said state. And it is, in particular, my wish and desire that in no event shall any part of my estate, real or personal, go to or descend to Jacob Wilson, who married Elizabeth Wheatley, daughter of Ezekiel Wheatley, and in no shape shall he be administrator of my estate."

"Twelfth. It is my will and desire that my friend, William Rea, with the desire of the persons interested in the trust property and of full age, shall have authority to sell and convey the lands and tenements devised to him in trust, or any part of them, on such terms as he shall deem advisable, receive the purchase money, and invest the same in some safe securities for the benefit of those indicated and declared by this will, and in the manner declared."

"Thirteenth. It is my will and desire that my friend, William Rea, shall be the executor of this my last will and testament, and that he shall be entitled to have and receive for his trouble and personal expenses ten per cent. on the inventory as executor, and also ten per cent. on the money he shall pay over as trustee to the several persons interested in the trust, in addition to any other expenses he may deem it just and right to incur for the benefit of the property confided to him as executor or trustee."

On the same day he added a codicil, in which he made a bequest of a silver pitcher to each of two friends, and afterwards, on the 27th of October, 1840, he executed a second codicil, by which he ratified and confirmed his will, "save and except such clauses, bequests and devises therein mentioned as are by me hereinafter revoked and made void." He then revoked the fourth clause of his will, and substituted therefor the following:

"I give and devise unto the said L. M. Roberts, in addition to the above during her natural lifetime and no longer, all that farm I purchased of James A. Waddell, the then sheriff of Dorchester county, as the property of William A. Wheatley, and after her death I give and devise the said farm unto my friend, William Rea, and his heirs and assigns forever, in trust for the benefit of my two negro boys, Daniel and Henry, in the same manner as provided for by the general provisions of this my will."

"The eleventh section of my will I revoke, so far as the same shall be found inconsistent with the following clause of this my codicil. If any bequest or devise contained in my last will and testament, or this my codicil, shall fail to take effect from any cause, in such an event I will and desire that the trustee and executor by this will appointed, shall immediately transfer the equitable and legal title to the same, be the same real or personal, (except negroes,) to the states of Delaware, Pennsylvania or New Jersey, for the benefit of said states, or either of them that will guarantee the freedom and emancipation of my slaves by this my will and codicil, to be liberated and freed, as well as my two young negroes, Washington Decatur, aged about fifteen months, and my negro girl Diana, aged about nine

months, whom I hereby manumit and set free at my death, and I desire my executor and trustee to provide for their support out of my funds belonging to my estate until they shall be able to obtain their freedom under this my codicil and the laws of this state, and to have their part of the property devised under the eighth clause of my will. All that clause of my will providing for the sale of my real estate by my executor and trustee I do hereby revoke and annul, as I do not wish the same sold, or any part thereof."

There was also a third codicil executed on the 2d June, 1841, making an additional devise of a house to his boy Daniel, and also one to Henry, and some wearing apparel to his negro women.

Such proceedings were then had under this bill that a decree was passed the 7th of June, 1850, to sell this real estate by Ezekiel R. Hooper, a trustee, appointed for that purpose in the usual form of such decrees. The sales were made by this trustee for $7280, and reported 20th February, 1851, and finally ratified by the court 5th November, 1851. The other proceedings in the cause are sufficiently stated in the following opinion of the Chancellor.]

THE CHANCELLOR:

The question which arises and has been argued in this case is presented by certain petitions which have been filed since the property was sold under the decree of the 7th of June, 1850. That decree was passed upon the bill filed by certain parties claiming under the will of William S. Harper, deceased, in which it was alleged that the interest of all parties concerned would be promoted by a sale. John D. Farquharson, one of the petitioners, was a party to the bill, he having been substituted in the place of William Rea, the trustee named in the will of the deceased, and by his answer he admitted the allegations of the bill, and consented to the passing of the decree.

After the trustee's report of the sale had been ratified, Jacob Wilson, by his petition filed on the 30th of July, 1851, stated that he was one of the purchasers, and claimed, by virtue of a

15*

deed and an assignment of Henry Robinson, one of the devisees under the will, the proportion of the proceeds of the sale to which he, Robinson, was entitled. The deed bears date the 25th of June, 1850, and purports, for the consideration of $750, to convey to Wilson all the interest of the grantor in the real estate of Harper, derived under his will. The assignment, which was executed on the 15th of July, 1851, being subsequent to the sale under the decree, purports for value received to transfer to Wilson the right of Robinson to the proceeds of the sale. And the petitioner, Wilson, prays that the proportion of the proceeds of the sale to which he is entitled by virtue of the transfer from Robinson to him, may be credited to him and deducted from his purchase. Robinson was made a party to this petition, and by his answer admitted its allegations, and consented to its prayer.

But afterwards and before an order had passed, Farquharson interposed his petition, in which he alleges that if such sale has been made as is set up in the petition of Wilson, the consideration is grossly inadequate, and the deed was extorted from Robinson by fraudulent practices and representations on the part of Wilson, and that the answer of Robinson to the petition was procured by like fraudulent practices, and he prays that Wilson may be required to answer his petition and the deed set aside, and the proceeds of sale paid to the petitioner, as trustee, to be invested and applied to the use of the parties. The answer of Wilson to this petition denies every allegation affecting the *bona fides* of the transaction, and insists that the sale from Robinson to him was fair, and for the full consideration of $750, for which he gave his single bill with interest from the date of the deed.

Upon comparing the amount of the purchase money agreed to be given by the petitioner, Wilson, with the proceeds of the sale made by the trustee, after making every reasonable allowance for those circumstances which it is said caused the property to sell for more than its intrinsic value, there certainly does appear a startling disparity, and it would seem impossible to say that the price agreed to be given is not grossly inadequate

to the value of the property, being very little more than one-fourth of the grantor's proportion of the proceeds of the sale. The amount to be paid by Wilson is $750, whilst the grantor's proportion of the proceeds of the sale will be very little short of $2800.

If this disparity is not sufficient to shock the conscience, as some of the cases express it, it is difficult to conceive what would. But it is said, and here lies the difficulty and turning point of the case, that Robinson the grantor is and was *compos mentis*, and being so, and having made sale of the property, and having by his answer declared his willingness that Wilson shall enjoy the benefit of it, no one has a right to interfere and forbid it. Certainly this court would not, nor is it presumed any court would, undertake to interfere with a man's right to dispose of his own property upon any terms he pleases. He may not only sell it for an inadequate price, but he may give it away, and if he be of competent understanding, and the rights of creditors are not involved, no court has a right to say one word about it. I have been unable to discover anything in the evidence in this cause to show that the grantor was not *compos mentis*. Neither are the circumstances relied on sufficiently strong to raise a presumption of the fraud or imposition said to have been practiced by the grantee, and, therefore, if the title of the grantor to the property was such as he could absolutely dispose of, the transfer must stand and have its full effect, although the thing sold was worth four times as much as has been contracted to be given for it. Whether Robinson had a right to dispose of this property absolutely, depends upon the will under which he took it. That will, after several provisions and a clause manumitting his slaves, of whom Henry Robinson the grantor was one, contains the following clause: "I give and devise to William Rea, his heirs and assigns, all the residue of the lands I purchased from Francis H. Waters and George Robertson and wife, (which I have not already devised to William Rea in trust for my negro boy Daniel,) and also the lands I purchased from Thomas Birely and wife, I devise to William Rea and his heirs, all in trust, to be rented out by him, and the

rents and profits to be received by him and annually paid to my negro boy Henry, or his order, attested by some justice of the peace."

Then follows a clause saying that any and all receipts given by any legatee, or *cestui que trust*, attested by any justice of the peace, shall be good and effectual releases and discharges for the same, or so much thereof as in such receipt or receipts shall be expressed to be received. The tenth clause is in these words: "It is my will and desire that immediately after the decease of any of the legatees, or *cestui que trusts*, William Rea, trustee aforesaid, shall pay over whatever property he shall then have as trustee to the legal representative and heirs at law of the said deceased, unless the deceased shall make some other appointment by his last will and testament, executed according to law." The twelfth clause contains this provision: "It is my will and desire that my friend, William Rea, with the desire of the persons interested in the trust property and of full age, shall have authority to sell and convey the lands and tenements devised to him in trust, or any part of them, on such terms as he shall deem advisable, receive the purchase-money and invest the same in some safe securities for the benefit of those indicated and declared by this will, and in the manner declared."

By a second codicil, the testator devised to the same trustee, and his heirs and assigns, another parcel of land after the determination of the life estate which another devise took "in trust for the benefit of the said negro boys, Daniel and Henry, to be by him rented out, and the rents and profits by him paid over to the said boys, Daniel and Henry, in the same manner as provided for by the general provisions of the will."

By this codicil, the clause of the will providing for a sale of the real estate of the testator by his executor and trustee is revoked, and a desire expressed that no part thereof be sold.

There is also a clause in the will in which the testator expresses an earnest wish that in no event shall any part of his estate, real or personal, go to or descend to Jacob Wilson, who married Elizabeth Wheatley, daughter of Ezekiel Wheatley, and that in no shape should he be administrator of the estate.

But whether the person here referred to, and the Mr. Wilson mentioned in these proceedings, is one and the same person, does not appear, nor am I prepared to say, (assuming them to be the same,) that the question presented by these petitions would be materially affected by it, though I cannot help thinking the circumstance of such declaration being made by the testator should have induced the person indicated to be cautious how he dealt with the property.

The question, however, is, had Henry Robinson such an estate in the real property mentioned in this will as enabled him to part with the absolute title in fee ? If he had, the sale to Mr. Wilson must stand, and the prayer of his petition be gratified. If he had not, Mr. Wilson must take the consequences of dealing with a person who had no right to sell.

It is very clear, I think, that the testator did not intend to confer any such power on this devisee. Rea, the trustee, was directed to rent the estate out, and to pay the rents and profits received by him, annually, to the order of Henry, attested by a justice of the peace. So far from authorizing the *cestui que trusts* to sell the estate, the power which by the will was given to the trustee to sell, with the concurrence of the parties interested being of full age, and to invest the proceeds upon similar trusts was revoked by the codicil, and a desire expressed that no part of the real estate should be sold. The tenth clause of the will furnishes pregnant evidence that the testator never contemplated conferring upon any of the *cestui que trusts* the power of sale. It declares that immediately after the decease of any of the legatees, or *cestui que trusts*, Rea, the trustee, shall pay over whatever property he shall then hold in that capacity to the legal representatives and heirs at law of the deceased, unless the deceased shall make some other appointment by his last will and testament, executed according to law.

The testator then manifestly intended that the object of his bounty should receive from the hands of his trustee the rents and profits of the lands during their respective lives, with the power of appointing by will, who should receive whatever should remain in the hands of the trustee at the time of their

death, and in case no such power should be exercised, that then the property should be delivered over by the trustee to the heirs at law, or the legal representatives of the deceased, free altogether from the trust which then was to terminate.   It can scarcely be supposed that the testator designed to confide to either of these *cestui que trusts*, the uncontroled power to dispose, absolutely, of the estate, when, as we have seen, he revoked by his codicil the authority which, by his will, he had given to the trustee to sell with the concurrence and approbation of the parties interested.   Why should he take from the trustee and *cestui que trusts* combined, the power to do that which the latter, without the co-operation of the former might do?   It surely was a very idle precaution on the part of this testator to declare that the trustee and *cestui que trusts* together should not sell the estate if he had so framed his will as to enable the *cestui que trusts* to do so by themselves.   Looking at the whole will, I am persuaded I should be totally disregarding the intention of the testator if I should decide that Henry Robinson had the power to dispose of this property absolutely in his lifetime by deed, and as the intention of the testator, when not repugnant to the rules of law, shall prevail, I do not feel myself at liberty to make such decision.   In the case of *Dashiell* vs. *Dashiell*, 2 *H. & G.*, 127, the Court of Appeals say, "The position is undeniable, that in the judicial interpretation of wills, the intention of the testator, to be gathered from the entire instrument, shall prevail, unless it violates some established principle of law."   And the same principle had been repeatedly asserted before and has been since.   No principle of law is, as I think, violated by giving effect to the intention of the testator in this case, and by declaring in conformity with that intention, that Henry Robinson had no power to make, in his lifetime, an absolute disposition of this property.

It does not appear to me that the state of the case is at all altered, or the rights of the parties changed by the sale which has been made under the decree in this case.   The property was decreed to be sold, because, as alleged by the bill, and established by the proof, it was for the interest and advantage of all parties interested, that it should be sold and the proceeds di-

vided among them according to their several and respective proportions and invested for their use and benefit. The object of the bill, and the decree which authorized a sale, was to promote the interests of the parties, by rendering the property in some new shape more productive, and not to enlarge the power of the *cestui que trusts* over it. The money or bonds derived from the sale were to be brought into court, to be disposed of under its direction, and should be invested, subject, in all respects, to the trusts of the will.

The petitioner, Farquharson, the substituted trustee, was a party to the bill, and I do not think his trust ceased with the sale of the property under the decree. On the contrary, unless some sufficient reason can be shown, he is the person who should make the investment, and hold the fund in trust for all the parties interested. So far, therefore, from being an intermeddler in the cause, he was, in my opinion, perfectly justifiable in interposing and raising the question of the validity of the sale by the *cestui qui trust* to Mr. Wilson.

But apart from the want of power on the part of the vendor to make the sale to Mr. Wilson, there are other circumstances which cannot be overlooked in deciding upon its validity. The vendor can neither read nor write. His mark is affixed to all the papers executed by him, including his answer to the petition of Mr. Wilson, and there is no very satisfactory evidence that they were read or fully explained to, and understood by him. The proof upon this point is, to say the least, doubtful, and when the vast disproportion between the value of the property sold, and the price stipulated to be paid for it is considered, it would seem eminently proper that the transaction should be free from all suspicion, that the party most liable to be imposed upon, was not fully aware of what he was doing. When it is apparent, upon the face of the transaction, that property had been sold at an enormous sacrifice, and it is shown that the party making the sacrifice is totally uneducated and incapable of reading or writing, a reasonable ground for supposing that he may not have understood what he was doing, cannot be without its influence in deciding upon the validity of

the sale.   Here is a case where property has been sold at about
one-fourth its value.   An inadequacy so great as, in the lan-
guage of *Lord Eldon*, in *Coles* vs. *Trecothick*, 9 *Vez.*, 246, "to
shock the conscience, and to amount, in itself, to conclusive and
decisive evidence of fraud," and which would of itself be a sufficent
ground for refusing a specific performance of a contract if it re-
mained unperformed.   But it is said, this is an executed contract,
and the purchaser comes here simply asking for the fruits of his
purchase, which the vendor is willing he shall have.   The an-
swer to this is, the vendor can neither read nor write, and it
does not very clearly appear, whether the papers to which he
has put his mark were read to him or fully understood by him, and
that in a transaction where the price is so far short of the value
of the thing sold as to subject it, without any other circumstance,
to the reprobation of the court, every thing which can remove
the suspicion of misapprehension or mistake on the part of the
person making the sacrifice, should be supplied by him who
sets up the contract.

There is, moreover, another thing apparent 'upon this record
which weighs heavily against the purchaser.   The deed, by
which Henry conveyed the property to Mr. Wilson, bears date
the 25th of June, 1850, and in the body of it, there is an ac-
knowledgment of the receipt of the seven hundred and fifty
dollars, the consideration money, and yet in point of fact, the
money was not paid at the time, nor has it been paid since.   It
appears from the evidence of Samuel Twilley, that he sold to
Henry a house and lot for two hundred and twenty-five dollars,
upon the responsibility of Mr. Wilson, and that he has received
from him on account the sum of seventy-five dollars, and this is
all, so far as this record discloses, that Wilson has paid on ac-
count of his purchase of Henry.   And his engagement to Twil-
ley to pay the balance of the $275, is verbal merely, Wilson
having, as the witness states, given him no written obligation
therefor.

But not only has Mr. Wilson taken from Henry a convey-
ance of this property, without having then or since paid the
purchase money, but there is strong reason to think the security

he gave Henry for it is invalid.  Joseph H. Bell, one of the magistrates by whom the acknowledgment of the deed from Henry was taken, says, "Mr. Wilson, at that time, gave to Henry an obligation, to which the latter made no objection."  And further, "he thinks the note was not upon stamped paper; cannot say for certainty, but thinks it was written upon a common sheet of paper."  And again, upon cross-examination, he says, "the note was drawn there" (that is, at the time of the acknowledgment of the deed) "to the best of my knowledge on unstamped paper, though as to this I do not speak with absolute certainty."  And the proof of the other justice is not at all in conflict with this.  It may be assumed, then, I think, as more than probable, not only that no part of the purchase money had been paid, except the seventy-five dollars paid to Mr. Turley, but that the obligation given by Mr. Wilson to Henry, is an invalid security for want of a stamp.  It is true, the omission to use stamped paper for the obligation in question, may be remedied in the mode pointed out in the 8th section of the act of 1844, ch. 280, by making the affidavit, and paying the sum of ten dollars, as is therein provided, but this does not obviate the objection that the transaction is characterized by a looseness, and want of care, which, looking to the great inadequacy of the price to be paid, should incline the court against giving effect to it.

It cannot, I think, be supposed that Henry knew, not only that he was parting with his property for one-fourth of its value, but that the security which he took for the payment of the purchase money was void, as it was executed and delivered to him.

The petitioner, Farquharson, prays that the deed from Henry Robinson to Mr. Wilson, may be set aside, and that the proceeds of the sale may be paid to him.  That part of the prayer which asks for the vacation of the deed, cannot be granted, because, I do not feel myself at liberty in this cause, and upon these proceedings, to decide that question, and to pronounce finally against the deed, nor am I at this time prepared to say that the proceeds of the sales shall be paid to the petitioner for the purpose of investment.  The petition, however, will be retained with liberty reserved to pass such future order upon it

as, in the further progress of the cause, may appear to be proper.

The petition of Mr. Wilson prays that the trustee who made the sale, under the decree in this cause, may be authorized and directed, by an order, to credit upon his purchase, the amount of Henry Robinson's interest in the lands so sold. But, as for the reasons stated, I am of opinion, he is not entitled to this relief, his petition will be dismissed.

PRATT and RANDALL, for Wilson.
ALEXANDER, for the Trustee.